# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

DREAMR LABS LIMITED

      Plaintiff

      v.

                                           Civ. Action No.
                                           21-CV- ___- _____

DELCHAIN LIMITED,
DELTEC BANK & TRUST LIMITED,
BRUNO MACCHIALLI,
SUISSE FINANCE HOLDINGS, and
RICHARD IAMUNNO

      Defendants.
-----------------------------------------------------------------X

## COMPLAINT AND DEMAND FOR JURY TRIAL

      Plaintiff, Dreamr Labs Limited ("Plaintiff" or "Dreamr"), by and through its undersigned counsel, by its Complaint against the following defendants: (1) Delchain Limited; (2) Deltec Bank & Trust Limited; (3) Bruno Macchialli; (4) Suisse Finance Holdings; and (5) Richard Iamunno alleges as follows:

## NATURE OF THE CASE

      This is an action against defendants for: (1) breach of contract; (2) fraudulent inducement: (3) conversion; (4) tortious interference; (5) fraud; and (6) defamation.  Defendants, individually and collectively, caused Dreamr to lose more than $20 million.  Dreamr retained and paid each defendant to provide certain advisory services concerning Dreamr's attempt to launch and list Dreamr's DMR crypto-tokens (the "Tokens") on a recognized cryptocurrency exchange, namely among others Bittrex Global.  Rather than support Dreamr's endeavor, each defendant instead conspired against Dreamr and sabotaged Dreamr's crypto-token launch by, among other

things, (1) causing a delay of the release of Dreamr's Tokens; (2) preventing and stalling the transfer of Dreamr's Tokens out of its own bank accounts; and (3) coercing Dreamr into an unjustified settlement agreement in exchange for additional compensation. All defendants were well aware that there was no legitimate reason to delay the release of the Tokens, but nonetheless defendants promoted lies in order to extort Dreamr into issuing additional Tokens to defendants and increasing banking and advisory fees. Unbeknownst to Dreamr, defendants had pre-existing, complex, interlocking relationships, which defendants failed to disclose. As a direct result of defendants' actions, Dreamr's Tokens crashed ninety-three percent (93%) in the first ninety (90) days.

In short, all defendants breached their duty to provide advisory and consulting services. However, all contract disputes between Dreamr and defendant Suisse Finance Holdings are subject to confidential arbitration, not litigation. Notwithstanding, the parties' arbitration clause does not bar Dreamr from bringing actions against Suisse Finance Holdings for (1) tortious interference and (2) defamation, as set forth below.

## **THE PARTIES**

1.      Dreamr Labs Limited ("Dreamr") is an entity incorporated under the laws of the Bahamas, with offices in Brooklyn, New York and is dedicated to building and publishing open-source software.

2.      Delchain Limited ("Delchain") is a full-service multi-currency banking asset management, trading and advisory firm that supports blockchain companies and is an entity incorporated under the laws of the Bahamas.

3. Deltec Bank and Trust Limited ("Deltec") is a licensed and regulated financial services institution incorporated under the laws of the Bahamas, and the parent company of Delchain.

4. Bruno Macchialli ("Macchialli") is the Chief Executive Office of Delchain, who resides and conducts business in Porte Vedra, Florida.

5. Suisse Finance Holdings ("SFH") is a Swiss-domiciled company with offices located in Lugano, Switzerland that provides financial and banking services.

6. Richard Iamunno ("Iamunno") is the Chief Investment Officer for Atlantic International Capital LLC ("Atlantic"), and he resides and conducts business in Boca Raton, Florida.

## JURISDICTION AND VENUE

7. Federal diversity jurisdiction exists pursuant to 28 U.S.C. §1332. Plaintiff conducts its business in New York, and all defendants' principal places of business or residence are outside of New York. Therefore, complete diversity of citizenship exists. The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.

8. Venue is proper pursuant to 28 U.S.C. § 1391 because Dreamr has offices in Brooklyn, New York and a substantial part of the events and omissions on which the claims asserted herein occurred in this District.

## GENERAL ALLEGATIONS

### Dreamr's Advisory Agreements with Defendants

9. In and around January 12, 2021, Plaintiff and Delchain entered into a Financial Advisory Agreement, whereby Delchain agreed to, among other things, advise and prepare a project for a Marketed Token Listing or a similar alternative best suited for the project with a

recognized known cryptocurrency exchange and to assist Dreamr in reaching a target fund raising goal of $5 million.

10. Bruno Macchialli ("Macchialli") is the Chief Executive Officer of Delchain.

11. Macchialli was Dreamr's main point of contact with Delchain concerning the launching and listing of the Dreamr crypto-token.

12. By way of background, the term "crypto-token" refers to specific virtual currency that represents an asset and resides on its own blockchain ledger.

13. Such tokens can be traded on cryptocurrency exchanges (which are similar to various stock exchanges) for investment purposes, used to store value, or to make purchases.

14. In an effort to raise funds for Dreamr's launch and crypto-currency listing, Dreamr entered into an Advisory Services and Option Agreement with Suisse Finance Holdings ("SFH"), dated March 12, 2021, whereby SFH agreed to, among other things, prepare a suitable investment package for potential investors as well as facilitate introductions to potential investors.

15. Dreamr entered into yet another advisory agreement with Atlantic International Capital LLC ("Atlantic") on or about March 20, 2020, whereby Atlantic agreed to, among other things, "[f]ast track account approval process."

16. Richard Iamunno ("Iamunno") was the Chief Investment Officer at Atlantic, and he was Dreamr's contact person at Atlantic.

17. At the instructions of Dreamr's various advisors, Dreamr opened a banking account with Deltec Bank & Trust Limited ("Deltec"), which agreed to provide certain e-banking and electronic channel services.

18.     In preparation of Dreamr's launch and listing, Dreamr spoke with Delchain and Macchialli at least once a week for nearly an entire year and paid in excess of $80,000 in services consulting fees and banking fees.

19.     Given that Dreamr had retained Delchain, Deltec, SFH to provide guidance in support of Dreamr's launch and listing, Dreamr relied upon and followed all advice and recommendations provided by defendants.

20.     Pursuant to recent telephonic recordings, to which Macchialli consented, Macchialli agrees that Dreamr bears no responsibility for the botched launching and listing of the Dreamr Tokens.

21.     The clunky and unsuccessful launch and listing of the Dreamr Tokens falls squarely on all defendants.

### Delchain Mishandled the Due Diligence Process and Delayed the Token Launch and Listing

22.     Dreamr coordinated the Dreamr Token launch and listing of its newly minted Tokens with a highly advertised charitable event, which was initially scheduled for August 31, but had to be pushed to September 7th.

23.     The timing of the Dreamr Token listing on Bittrex and the Dreamr Token launch were synchronized with and between Deltec and Bittrex.

24.     Dreamr signed its listing agreement with Bittrex on August 3rd, 2021, and paid 130,000 Swiss Francs to list on the Bittrex platform.

25.     On or about August 28th, 2021, as press releases were ready to go and all the providers aligned to launch the Dreamr Tokens on August 31st, 2021, Macchialli stopped the Dreamr Token launch for additional due diligence concerns, which had already been addressed and resolved during the nine (9) months prior.

26.     Macchialli decided the Dreamr Token launch had to be delayed, even though Bittrex had already approved a market open date for the Dreamr Tokens.

27.     Macchialli wanted to funnel certain assets through Delchain before listing on the Bittrex exchange.

28.     It was not necessary to funnel certain assets through Delchain in order to launch and list the Dreamr Tokens.

29.     Macchialli's unilateral decision to halt the launch and listing process caused Dreamr and the Dreamr Token to lose momentum, interest, and ultimately value.

30.     Bittrex went from being highly engaged to list immediately the Dreamr Token to being unresponsive and pushing back the listing date after the targeted August 31st date was missed.

31.     The Dreamr Token listing on Bittrex took place on September 10th simultaneously with a listing on the Uniswap decentralized exchange.

32.     The delay in listing in Dreamr Token cost Dreamr approximately $10 million. All defendants had confirmed that a proper and well-publicized launch of the Dreamr Tokens would push the Dreamr Tokens to $1.00 per Token – well over $100 million in total.

33.

**Delchain, Deltec, and Macchialli Next Refuse to Release the Dreamr Tokens**

34.     On or about November 17, 2021, as Dreamr's project progressed and the Dreamr Token launch and listing with Bittrex was completed, Dreamr contacted Delchain and requested the transfer of the Dreamr Tokens, which were being stored in accounts at Delchain and under the custody of Deltec.

35.     According to Tradingview.com, in or around November 17 the Dreamr Tokens held in Dreamr's account at Delchain and Deltec were valued at $0.12(+) cent per Token or roughly $21,793,346 million in total.

36.     For more than seven (7) days, however, Delchain, Deltec, and Macchialli refused to release the Dreamr Tokens under various false pretenses.

37.     Macchialli first claimed that Delchain and Deltec needed to schedule a video conference before the Dreamr Tokens could be released and listed.

38.     Macchialli had never advised that such a video conference would be necessary.

39.     In the past, Dreamr had made previous requests for the release of the Dreamr Tokens, and no video conference was ever required.

40.     In any event, the video conference was held and scheduled within forty-eight (48) hours.

**False Allegations of Fraud Are Made Against Dreamr**

41.     Macchialli, Delchain, and Deltec next claimed that they had received a letter from a third-party alleging fraud on Dreamr's part and certain other irregularities.

42.     Based exclusively on the third-party letter, Delchain, Deltec, and Macchialli refused to release the Dreamr Tokens.

43.     Dreamr demanded that Delchain, Deltec, and Macchialli forward the third-party letter to Dreamr.

44.     Delchain, Deltec and Macchialli refused to forward the third-party letter.

45.     Dreamr demanded that Delchain, Deltec, and Macchialli reveal the identity of the third-party making the allegation(s) of fraud.

46.     Delchain, Deltec, and Macchialli refused to reveal the identify of the third-party making the allegation(s) of fraud.

47.     Dreamr demanded that Delchain, Deltec, and Macchialli provide any authority, law, rule, regulation or policy that justified the refusal to release the Dreamr Tokens based solely on third-party accusations of alleged fraud.

48.     Delchain, Deltec, and Macchialli refused to provide any authority, law, rule, regulation or policy that justified the refusal to release the Dreamr Tokens based solely on third-party accusations of alleged fraud.

49.     Delchain, Deltec, and Macchialli asserted that the identity of the third-party as well as the exact content of the third-party letter were confidential.

50.     Dreamr never had the opportunity to address the fraud claims asserted by the unidentified third-party.

51.     For each day that Delchain, Deltec, and Macchialli refused to release the Dreamr Tokens, the value of the Dreamr Tokens dropped steadily.

52.     On or around November 26, 2021, Delchain, Deltec, and Macchialli completed an investigation of the alleged fraud claims, as set forth in the unidentified third-party letter.

53.     On or around November 26, 2021, Delchain, Deltec, and Macchialli concluded that there was no basis for alleged fraud claims, as set forth in the unidentified third-party letter.

54.     On or about November 26, 2021, when Delchain and Deltec agreed to release the Dreamr Tokens, the value of the Dreamr Tokens had dropped from $0.12 cents per Token to $0.06 cents per Token – representing a loss of more than $10 million.

55.     While Delchain, Deltec, and Macchialli refused to release the Dreamr Tokens, they were aware that certain other parties, including all defendants, were selling certain Dreamr Tokens that were already on the market.

56.     Certain parties, including all defendants, profited from the sale of certain Dreamr Tokens, while other Dreamr Tokens remained "hostage."

## SFH is Exposed as the Third-Party

57.     After Delchain and Deltec released the Dreamr Tokens, Dreamr entered into discussions with Delchain, Deltec, and Macchialli concerning compensation for Dreamr's losses that occurred due to the failure to release the Tokens in a timely manner.

58.     As part of that discussion, Delchain, Deltec, and Macchialli revealed that SFH was the third-party that had written the third-party letter alleging fraud and other irregularities.

59.     Dreamr demanded that Delchain, Deltec, and Macchialli release the letter that SFH had written (the "SFH Letter").

60.     Delchain, Deltec, and Macchialli refused to release the SFH Letter to Dreamr.

61.     Delchain, Deltec, and Macchialli refused to confirm the exact and specific language set forth in the SFH Letter.

62.      Dreamr and SFH were already parties to an Advisory Services and Option Agreement, such that SFH had a fiduciary duty to support – not sabotage – Dreamr's efforts.

63.     Dreamr was disappointed, but not entirely surprised, to learn that SFH was the third-party spreading vicious and damaging lies about Dreamr.

64.     Over time, SFH had become increasing hostile towards Dreamr.

65.     Prior to sending the third-party letter alleging fraud on Dreamr's part, SFH had made certain claims and demanded additional Dreamr Tokens.

66.     In early November 2021, SFH alleged that Dreamr breached a "lock up" agreement that allegedly restricted the sale of certain Dreamr Tokens, which were being held and stored with Delchain and Deltec.

67.     There is no executed written lock up agreement between Dreamr and SFH.

68.     Nonetheless, SFH demanded that Dreamr agree to release and distribute additional Dreamr Tokens to SFH in order to address the alleged breach – for which there is no basis.

69.     Dreamr refused to release any additional Dreamr Tokens to SFH.

70.     In return, SFH repeatedly threatened to file a lawsuit against Dreamr.

71.     In order to avoid a lawsuit, however, SFH forwarded at least two (2) proposed settlement agreements.

72.     The first settlement agreement stated that SFH "will not pursue any and all legal remedies for your violation of Token Hold Agreement."

73.     SFH never produced or provided the "Token Hold Agreement."

74.     There is no executed "Token Hold Agreement" between Dreamr and SFH.

75.     The First Settlement Agreement also listed Delchain as a signatory.

76.     Delchain, Deltec, and Macchialli were well aware of the First Settlement Agreement and its terms.

77.     Delchain, Deltec, and Macchialli were well aware that Dreamr refused to settle SFH's baseless claims.

78.     SFH, however, continued to press for a settlement.

79.     SFH's second settlement agreement stated "[a] dispute arose between the parties in which SFH decided to start legal proceedings against DMR in different territories."

80.     The Second Settlement Agreement did not mention any specific Dreamr breach or violation of any agreement or contract.

81.     Delchain, Deltec, and Macchialli were copied on email exchanges concerning SFH's proposed settlement agreements.

82.     In early November 2021, Delchain, Deltec, and Macchialli were fully aware that there was no basis to SFH's claims, because Delchain, Deltec, and Macchialli had access to information concerning the release, trading, selling and distribution of the Dreamr Tokens.

83.     Delchain, Deltec, and Macchialli were well aware that even if there were an executed written lock up agreement, there had been no breach, because no Dreamr Tokens had been sold.

84.     Thus, the Dreamr Tokens held by Delchain and Deltec remained "locked up."

85.     Nonetheless, without explanation and justification, Macchialli repeatedly encouraged Dreamr to execute a settlement agreement with SFH.

86.     Macchialli was fully aware that had Dreamr executed any settlement with SFH, Dreamr would be admitting to fraud, and required to pay SFH nearly $500,000 in Dreamr Tokens.

87.     Unbeknownst to Dreamr, SFH, Delchain, Deltec, Macchialli (and later Iamunno) were conspiring against Dreamr in order to receive additional Dreamr Tokens as well as additional advisory and banking fees.

88.     Dreamr refused to enter into any settlement agreement with SFH, because Dreamr never breached any contract or agreement with SFH.

89.     Dreamr did not understand Macchialli's insistence that Dreamr agree to any type of settlement.

90.     Dreamr began to question whether Macchialli was, in fact, acting in Dreamr's best interest.

91.     Based on Dreamr's concerns about Macchialli's loyalty and motives, Dreamr demanded the immediate release of all Dreamr Tokens that were in its own accounts at Delchain and under Deltec's custody.

92.     Rather than immediately release the Dreamr Tokens, Macchialli instead conspired with SFH to fabricate a reason for refusing to release the Dreamr Tokens.

**SFH Retaliates Against Dreamr**

93.     After Dreamr refused to execute SFH's proposed settlement agreements, SFH sought revenge and sent the damaging SFH letter to Delchain, Deltec, and Macchialli alleging fraud on Dreamr's part in order to gain leverage.

94.     Even though Delchain, Deltec, and Macchialli were well aware that there was no merit to SFH's claims, Delchain, Deltec, and Macchialli supported SFH's ruse and extortion attempts.

95.     Because Delchain, Deltec, and Macchialli were in cahoots with SFH, Delchain, Deltec, and Macchialli cited SFH's false allegations as the reason and justification for refusing to release the Dreamr Tokens – when Delchain, Deltec, and Macchialli were aware that there was no fraud.

96.     SFH leveraged its long standing, pre-existing relationship with Delchain, Deltec, and Macchialli, which in turn, used their custody of the Dreamr Tokens to force Dreamr to distribute more Dreamr Tokens to all defendants.

97.     Together SFH, Delchain, Deltec, Macchialli, and Iamunno worked to fabricate and promote allegations of fraud on Dreamr's part to justify the refusal to release the Dreamr

Tokens and give certain parties, including defendants, time to dump the Dreamr Tokens and exit into the open market.

98.     SFH, Delchain, Macchialli, and Iamunno hoped that they could hold the Dreamr Tokens "hostage" just long enough to sell off their Dreamr Tokens, and then force Dreamr to distribute even more Dreamr Tokens to defendants in exchange for signing a settlement and releasing the Dreamr Tokens.

99.     SFH hoped that its letter would cause Delchain, Deltec, and Macchialli to delay the release of the Dreamr Tokens.

100.    SFH hoped that the delay in releasing the Dreamr Tokens would allow SFH and certain other defendants an opportunity to sell off certain Dreamr Tokens in the market.

101.    SFH and other defendants then flooded the market with Dreamr Tokens.

102.    SFH and other defendants benefited from the sale of the Dreamr Tokens.

103.    Delchain, Deltec, and Macchialli facilitated SFH and its scheme.

104.    Because of their past, pre-existing business relationships, which were not fully disclosed to Dreamr, Delchain, Deltec, and Macchialli prioritized their relationships with SFH, Atlantic, and Iamunno over their limited and new relationship with Dreamr.

105.    All defendants failed to act in Dreamr's best interest.

**Delchain, Deltec, and Macchialli Continue to Betray Dreamr
by Disclosing Confidential Communication with SFH**

106.    On or around February 2022, Delchain, Macchialli, and Dreamr continued to have discussions about SFH and the SFH Letter alleging fraud.

107.    Although Delchain, Deltec, and Macchialli revealed that SFH was the source of the SFH Letter, Delchain, Deltec, and Macchialli still refused to release the actual SFH letter to Dreamr.

108.     Dreamr informed Delchain, Deltec, and Macchialli that Dreamr hoped to avoid any litigation, but that Dreamr needed the SFH Letter.

109.     If necessary, Dreamr would sue SFH in order to confirm the exact nature of SFH's fraudulent allegations, which had caused Delchain, Deltec, and Macchialli to refuse to release the Dreamr Tokens, which subsequently caused the value of the Dreamr Tokens to crash.

110.     Delchain, Deltec, and Macchialli informed Dreamr that Delchain, Deltec, and Macchialli would not release the SFH Letter, because SFH would not consent to release the SHF Letter to Dreamr.

111.     Unbeknownst to Dreamr, Delchain, Deltec, and Macchialli relayed the sum and substance of all confidential conversations to SFH, including Dreamr's possible intent to sue SFH for (1) breach of contract; (2) tortious interference; and (3) defamation.

112.     Within days after communicating with Delchain, Deltec, and Macchialli, legal counsel for SFH, Harry Winderman, wrote to Dreamr and for the third time SFH again threatened to bring a lawsuit and again alleged that Dreamr breached a lock up agreement.

113.     SFH's threats and allegations were not new, and merely rehashed SFH's prior threats and baseless allegations.

114.     SFH again threatened to sue if Dreamr refused to settle within ten (10) days.

115.     SFH threatened to sue Dreamr as well as the Dream Machine Foundation.

116.     The Dream Machine Foundation is an independent nonprofit corporation.

117.     There is no relationship between The Dream Machine Foundation and SFH.

118.     SFH's threat to sue the Dream Machine Foundation is merely an attempt to harm the Dream Machine Foundation's image and reputation.

119.     In effort to understand the basis for SFH's allegations, Dreamr repeatedly requested that SFH produce an executed written lock up agreement between Dreamr and SFH.

120.     In effort to understand the basis for SFH's allegations, Dreamr repeatedly requested that SFH produce any evidence confirming Dreamr's breach of any lock up agreement.

121.     SFH never produced any evidence confirming Dreamr's breach of any lock up agreement.

122.     SFH never produced an executed written lock up agreement between Dreamr and SFH.

123.     SFH admitted that there is no executed written lock up agreement between Dreamr and SFH.

124.     Instead, SFH presented a confidential email exchange, dated September 1, 2021, between Dreamr, Macchialli, and Iamunno concerning a lock up agreement to which SFH was not a party nor an intended beneficiary.

125.     Unbeknownst to Dreamr, on February 25, 2021, Iamunno forwarded the confidential September 1 email exchange to SFH without Dreamr's approval or authorization.

126.     Iamunno was well aware that SFH intended to use confidential September 1 email exchange in order to threaten a lawsuit against Dreamr.

127.     Upon information and belief, Dreamr's very own agent and representative – Iamunno – has been undermining Dreamr's efforts and forwarding confidential information to third-parties, namely SFH.

128.     At nearly every turn, all defendants, individually and collectively, took actions that harmed Dreamr's launch and listing of the Dreamr Token.

129.     Defendants, individually and collectively, caused Dreamr to lose millions of dollars, while each defendant was compensated or otherwise profited, at Dreamr's expense and to Dreamr's detriment.

## FIRST CAUSE OF ACTION
### (Breach of Contract Against Delchain)

130.     Dreamr hereby repeats, re-alleges, and incorporates paragraphs 1 through 130 as if fully set forth herein.

131.     Dreamr and Delchain are parties to an advisory agreement concerning, among other things, the launching and listing of Dreamr's Tokens.

132.     Pursuant to the terms of the advisory agreement, Delchain agreed to provide certain services, and in exchange Dreamr was to compensate Delchain.

133.     Dreamr fully compensated Delchain.

134.     Delchain, however, failed and refused to provide certain services in an appropriate or timely manner without explanation or excuse.

135.     As a direct and foreseeable result of Delchain's breach, Dreamr has suffered damages in an amount to be determined at trial, but in any event reasonably believed to be in excess of $20 million.

## SECOND CAUSE OF ACTION
### (Breach of Contract Against Deltec)

136.     Dreamr hereby repeats, re-alleges, and incorporates paragraphs 1 through 130 as if fully set forth herein.

137.     Dreamr and Deltec are parties to a services agreement concerning, among other things, the launching and listing of Dreamr's Tokens.

138.    Pursuant to the terms of the services agreement, Deltec agreed to provide certain services, and in exchange Dreamr was to compensate Deltec.

139.    Dreamr fully compensated Deltec.

140.    Deltec, however, failed and refused to provide certain services in an appropriate or timely manner without explanation or excuse.

141.    As a direct and foreseeable result of Deltec's breach, Dreamr has suffered damages in an amount to be determined at trial, but in any event reasonably believed to be in excess of $20 million.

## THIRD CAUSE OF ACTION
### (Fraud in the Inducement Against Delchain)

142.    Dreamr hereby repeats, re-alleges, and incorporates paragraphs 1 through 130 as if fully set forth herein.

143.    Delchain made certain statements concerning its intent and desire to assist Dreamr with launching and listing the Dreamr Token.

144.    Delchain's statements were false when made, because Delchain had no intention of assisting Dreamr with launching and listing the Dreamr Token, because Delchain was in cahoots with the other defendants, and all defendants intended to delay the launching and listing of the Dreamr Token in order to increase fees or compensation at Dreamr's expense.

145.    Delchain knew that the statements were false when made.

146.    Delchain made the false statements in order to induce Dreamr to rely on the statements and to enter into an agreement with Delchain.

147.    Dreamr relied on Delchain's false statements.

148.     Dreamr did not know that Delchain's statements were false when made, and Dreamr was completely unaware of the pre-existing and complex relationships between and amongst all defendants.

149.     As a direct and foreseeable result of Delchain's false statements, Dreamr has suffered damages in an amount to be determined at trial, but in any event reasonably believed to be in excess of $20 million.

## FOURTH CAUSE OF ACTION
### (Fraud in the Inducement Against Deltec)

150.     Dreamr hereby repeats, re-alleges, and incorporates paragraphs 1 through 130 as if fully set forth herein.

151.     Deltec made certain statements concerning its intent and desire to assist Dreamr with launching and listing the Dreamr Token.

152.     Deltec's statements were false when made, because Deltec had no intention of assisting Dreamr with launching and listing the Dreamr Token, because Deltec was in cahoots with the other defendants, and all defendants intended to delay the launching and listing of the Dreamr Token in order to increase fees or compensation at Dreamr's expense.

153.     Deltec knew that the statements were false when made.

154.     Deltec made the false statements in order to induce Dreamr to rely on the statements and to enter into an agreement with Deltec.

155.     Dreamr relied on Deltec's false statements.

156.     Dreamr did not know that Deltec's statements were false, and Dreamr was completely unaware of the pre-existing and complex relationships between and amongst all defendants.

157.     As a direct and foreseeable result of Deltec's false statements, Dreamr has suffered damages in an amount to be determined at trial, but in any event reasonably believed to be in excess of $20 million.

## FIFTH CAUSE OF ACTION
### (Conversion Against Delchain)

158.     Dreamr hereby repeats, re-alleges, and incorporates paragraphs 1 through 130 as if fully set forth herein.

159.     At all times, Dreamr was the rightful and undisputed owner of the Dreamr Tokens.

160.     Dreamr requested that Delchain release the Dreamr Tokens.

161.     Delchain interfered with Dreamr's property – the Dreamr Tokens – by refusing to release the Dreamr Tokens in a timely manner.

162.     Delchain deprived Dreamr possession of the Dreamr Tokens without authority or justification.

163.     As a direct and foreseeable result of Delchain's interference, Dreamr has suffered damages in an amount to be determined at trial, but in any event reasonably believed to be in excess of $20 million.

## SIXTH CAUSE OF ACTION
### (Conversion Against Deltec)

164.     Dreamr hereby repeats, re-alleges, and incorporates paragraphs 1 through 130 as if fully set forth herein.

165.     At all times, Dreamr was the rightful and undisputed owner of the Dreamr Tokens.

166.     Dreamr requested that Deltec release the Dreamr Tokens.

167. Deltec interfered with Dreamr's property – the Dreamr Tokens – by refusing to release the Dreamr Tokens in a timely manner.

168. Deltec deprived Dreamr possession of the Dreamr Tokens without authority or justification.

169. As a direct and foreseeable result of Deltec's interference, Dreamr has suffered damages in an amount to be determined at trial, but in any event reasonably believed to be in excess of $20 million.

## SEVENTH CAUSE OF ACTION
### (Tortious Interference Against SFH)

170. Dreamr hereby repeats, re-alleges, and incorporates paragraphs 1 through 130 as if fully set forth herein.

171. Dreamr is a party to agreements with both Delchain and Deltec.

172. SFH was aware of the nature of the contracts between Dreamr, on one side, and Delchain and Deltec, on the other side.

173. SFH knowingly and intentionally interfered with contracts between Dreamr, Delchain, and Deltec concerning the launching and listing of the Dreamr Token.

174. SFH interfered by making false allegations against Dreamr, which in turn caused Delchain and Deltec to refuse to release the Dreamr Tokens in a timely manner.

175. As a direct and foreseeable result of SFH's interference, Dreamr has suffered damages in an amount to be determined at trial, but in any event reasonably believed to be in excess of $20 million.

## EIGHTH CAUSE OF ACTION
### (Tortious Interference Against Iamunno)

176.     Dreamr hereby repeats, re-alleges, and incorporates paragraphs 1 through 130 as if fully set forth herein.

177.     Dreamr is a party to agreements with both Delchain and Deltec.

178.     Iamunno was aware of the nature of the contracts between Dreamr, on one side, and Delchain and Deltec, on the other side.

179.     Iamunno knowingly and intentionally interfered with contracts between Dreamr, Delchain, and Deltec concerning the launching and listing of the Dreamr Token.

180.     Iamunno interfered by making false allegations against Dreamr, which in turn caused Delchain and Deltec to refuse to release the Dreamr Tokens in a timely manner.

181.     As a direct and foreseeable result of Iamunno's interference, Dreamr has suffered damages in an amount to be determined at trial, but in any event reasonably believed to be in excess of $20 million.

## NINTH CAUSE OF ACTION
### (Fraud Against Macchialli)

182.     Dreamr hereby repeats, re-alleges, and incorporates paragraphs 1 through 130 as if fully set forth herein.

183.     Macchialli is a corporate officer who participated in the commission of a tort and is therefore individually liable for his actions against Dreamr.

184.     Macchialli made knowingly false and fraudulent claims concerning the conditions required to launch and list the Dreamr Tokens.

185.     Macchialli breached his fiduciary duty to assure that Dreamr received the best and most accurate advice concerning the launching and listing of the Dreamr Tokens.

186.     Macchialli placed and prioritized his relations with other defendants over and above his relationship with Dreamr.

187.     As a direct and foreseeable result of Macchialli's actions, Dreamr has suffered damages in an amount to be determined at trial, but in any event reasonably believed to be in excess of $20 million.

## TENTH CAUSE OF ACTION
### (Fraud Against Iamunno)

188.     Dreamr hereby repeats, re-alleges, and incorporates paragraphs 1 through 130 as if fully set forth herein.

189.     Iamunno is a corporate officer who participated in the commission of a tort and is therefore individually liable for his actions.

190.     Iamunno made knowingly false and fraudulent claims concerning Dreamr's alleged breach of a lock up agreement.

191.     Iamunno breached his fiduciary duty to assure that Dreamr received the best and most accurate advice concerning the launching and listing of the Dreamr Tokens by funneling and sharing confidential information with SFH, which, in turn, used that confidential information to threaten a lawsuit.

192.     Iamunno placed and prioritized his relations with other defendants over and above his relationship with Dreamr.

193.     As a direct and foreseeable result of Iamunno' s actions, Dreamr has suffered damages in an amount to be determined at trial, but in any event reasonably believed to be in excess of $20 million.

## ELEVENTH CAUSE OF ACTION
## (Defamation Against SFH)

194.    Dreamr hereby repeats, re-alleges, and incorporates paragraphs 1 through 130 as if fully set forth herein.

195.    SFH made knowingly false statements concerning fraud on behalf of Dreamr, and further alleged that Dreamr had breached a lock out agreement, and yet SFH admits that there is no such written executed lock up agreement between Dreamr and SFH.

196.    By letter to Delchain, Deltec, and Macchialli, SFH published the false statements, knowing that its allegations of fraud of Dreamr's part would cause Delchain, Deltec, and Macchialli to refuse to release the Dreamr Tokens in a timely manner.

197.    There was no basis for SFH's false statements.

198.    Based on the SFH Letter, Delchain, Deltec, and Macchialli, in fact, did refuse to release the Dreamr Tokens, which delayed the launch and listing of the Dreamr Tokens with Bittrex.

199.    SFH's statements were intended to, and in fact did, injure Dreamr's business and reputation.

200.    As a direct and foreseeable result of SFH's statements, Dreamr was defamed and has suffered damages in an amount to be determined at trial, but in any event reasonably believed to be in excess of $20 million.

## TWELFTH CAUSE OF ACTION
## (Defamation Against Iamunno)

201.    Dreamr hereby repeats, re-alleges, and incorporates paragraphs 1 through 130 as if fully set forth herein.

202.     Iamunno made knowingly false statements concerning fraud on behalf of Dreamr, and further alleged that Dreamr had breached a lock out agreement, and yet Iamunno was well aware that there had been no breach of any lock up agreement.

203.     Iamunno conveyed his false statements to Delchain, Deltec, and Macchialli, knowing that his allegations of fraud on Dreamr's part would cause Delchain, Deltec, and Macchialli to refuse to release the Dreamr Tokens in a timely manner.

204.     There was no basis for Iamunno's statements.

205.     Based on Iamunno's statements, Delchain, Deltec, and Macchialli, in fact, did refuse to release the Dreamr Tokens, which delayed the launch and listing of the Dreamr Tokens with Bittrex.

206.     Iamunno's statements were intended to, and in fact did, injure Dreamr's business and reputation.

207.     As a direct and foreseeable result of Iamunno's statements, Dreamr was defamed and has suffered damages in an amount to be determined at trial, but in any event reasonably believed to be in excess of $20 million.

**WHEREFORE**, Dreamr requests the following relief:

(a) As for the first cause of action for breach of contract against Delchain, a judgment against Delchain finding a breach of contract, for which Dreamr has suffered damages in the amount of $20 million, plus interest, costs, attorneys' fees, expenses, and disbursements;

(b) As for the second cause of action for breach of contract against Deltec a judgment against Deltec finding a breach of contract, for which Dreamr has

suffered damages in the amount of $20 million, plus interest, costs, attorneys' fees, expenses, and disbursements;

(c) As for the third cause of action for fraudulent inducement against Delchain, a judgment against Delchain finding fraudulent inducement, for which Dreamr has suffered damages in the amount of $20 million, plus interest, costs, attorneys' fees, expenses, and disbursements;

(d) As for the fourth cause of action for fraudulent inducement against Deltec, a judgment against Deltec finding fraudulent inducement, for which Dreamr has suffered damages in the amount of $20 million, plus interest, costs, attorneys' fees, expenses, and disbursements;

(e) As for the fifth cause of action for conversion against Delchain, a judgment against Delchain finding conversion, for which Dreamr has suffered damages in the amount of $20 million, plus interest, costs, attorneys' fees, expenses, and disbursements;

(f) As for the sixth cause of action for conversion against Deltec, a judgment against Deltec finding conversion, for which Dreamr has suffered damages in the amount of $20 million, plus interest, costs, attorneys' fees, expenses, and disbursements;

(g) As for the seventh cause of action for tortious interference against SFH, a judgment against SFH finding tortious interference, for which Dreamr has suffered damages in the amount of $20 million, plus interest, costs, attorneys' fees, expenses, and disbursements;

(h) As for the eighth cause of action for tortious interference against Iamunno, a judgment against Iamunno finding tortious interference, for which Dreamr has suffered damages in the amount of $20 million, plus interest, costs, attorneys' fees, expenses, and disbursements;

(i) As for the ninth cause of action for fraud against Macchialli, a judgment against Macchialli finding fraud, for which Dreamr has suffered damages in the amount of $20 million, plus interest, costs, attorneys' fees, expenses, and disbursements;

(j) As for the tenth cause of action for fraud against Iamunno, a judgment against Iamunno finding fraud, for which Dreamr has suffered damages in the amount of $20 million, plus interest, costs, attorneys' fees, expenses, and disbursements;

(k) As for the eleventh cause of action for defamation against SFH, a judgment against SFH finding defamation, for which Dreamr has suffered damages in the amount of $20 million, plus interest, costs, attorneys' fees, expenses, and disbursements;

(l) As for the twelfth cause of action for defamation against Iamunno, a judgment against Macchialli finding fraud, for which Dreamr has suffered damages in the amount of $20 million, plus interest, costs, attorneys' fees, expenses, and disbursements; and

(m) All other and further relief that this Court deems just and proper.

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 10, 2022

LitigationSword Orel LLC / Sergei Orel, LLC

By: /s/ Reeves Carter

Reeves Carter
Of Counsel
Sergei Orel, LLC
2125 Center Avenue, Suite 608
Fort Lee, NY 07024
carter@litigationsword.com
*Attorneys for Plaintiff*
*Dreamr Labs, LLC*